When you're ready, Ms. Ben-Ami. Good morning. Good morning. May it please the court. Your Honors, all of UMAC's position on claim construction is rather simple. The patents have a definition. It's written in the specification. It is a straightforward definition. It says that a CARI, or an A-A-I-R, is an enzyme that catalyzes the conversion from acetolactate to 2,3-D-hydroxide isovalerate using NADPH as an electron donor. This court can simply say that's the definition. The district court said that the applicant was its own lexicographer. And if that is the case, then the district court should allow that lexicography. That definition is consistent with the ordinary definition in the art, and I would like to explain that. In this patent, there are two examples which talk about how one characterizes whether an enzyme is a CARI. There are example 2 and example 10. Both those examples refer to a single assay, which we're calling the ARFN assay, ARFN and UMBR. That assay was the gold standard assay at the time. It is the assay that is referred to in the EC number 1.1.1.86 as the primary reference. To understand that assay is to understand the meaning of the claim. Judge Robinson looked at the claim term which cites to the 1.1.1.86 European listing, which only lists NADPH. Does that claim term somehow invoke a limitation to NADPH as a co-factor? No, Your Honor. Let me explain if I may. The ARFN and UMBR assay is a very simple scientific assay. You take an amino acid sequence and you say, is that a CARI? How do I know? I put it in a test tube. I put in the substrate. And then I put in NADPH. And I measure whether NADPH is being converted to NADP using optical tensors. One variable, scientific method, one variable. If I see that that NADPH is changing into NADP, it is donating electrons. And the enzyme has done the substrate to product reaction. And therefore that enzyme, that chemical entity, is a CARI. Now, if I take that chemical entity, which uses NADPH as an electron donor, as indicated in the assay of the patent, and I put it in a system where there is only NADPH, it will use NADPH. If I put it in a different system where it only has NADH, it will use only NADH. If I put it in a mixed system, depending upon the condition, it will use NADH. Anaerobic or aerobic, right? In an anaerobic system where there is much, much more NADH, it will use NADH. It's going to use that. Exactly. So when I say it is all consistent, that is what I mean. Now, this court had this case on preliminary injunction. Yes, sir. And it gave some guidance. Do you think that guidance was followed? Or was that necessary to follow that guidance even? I mean, it was kind of just a thrown-in commentary. A bit of a suggestion. A hint. A hint. A hint, yes. I certainly don't think that the district court meant any disrespect to this court. I think the district court did what she felt was correct. I don't think that it was fair for the defendant to argue that this court was telling the district court to just take the case solely out. And that was what Jebo argued to the district court. And that Jebo argued that this court, through its questioning, was really affirming the original claim construction, just to take out that word. So I think this is an issue of law at this point, and we need to address it as it sits here. Of course, it was an issue of law at that point, too. It was. And the court did say that the claim construction was highly unquestionable, I believe was the language. And the district court judge did what it did. What do you make of the fact that the specification does make reference to both NADPH and NADH with respect to some of the other enzymes, but yet with respect to this one, it just refers to NADPH? It's a very important point. And the answer to that is reasonably straightforward. If you look at the specification, and it's talking about other enzymes, you will see that for those other enzymes, there are multiple EC numbers. And if you go into the record, and you look through the record, you will see that for one EC number, that the substrates might be slightly different. And the assay, the gold standard assay, may say use NADPH. You may see then the second EC number will say the substrates are slightly different, and the gold standard assay that they're using puts NADH in the test tube. And then there will be a third number where they say use a different assay, and they say you can use either one. None of those things tell you that when their definition says a carry, this chemical entity, uses NADPH as an electron donor, that it implies or states a negative limitation and not NADH and not both or anything like that. It simply says this is the gold standard way we look at it. It's consistent with the assay, which is considered in examples two and ten. When the examiner during prosecution of the 889 patent said, how do I know? What's the enablement of carries? The applicant specifically said the assay in example two is the way you determine whether it's a carry. So we have consistency in this patent using a straightforward definition. We have the consistency of the ordinary meaning, the consistency of 1.1.1.86, the consistency of example two and ten, which was confirmed in the prosecution, the 889 prosecution, which was not considered by the district court, unfortunately. We also have the consistency of allowing claim 14 of the 889 patent to have meaning and the consistency of having claim 15 of the 188 patent have meaning. Claim 15 is a very important claim. We did not discuss it during the preliminary injunction because we were only here on the 889 patent. Claim 15 specifically claims the four preferred embodiments for a carry. It says wherein the carry is one of these. And so it specifically claims the Methanococcus example, specifically. Now, the Methanococcus example in the prior art was known to be NADH utilized. And as GEVO's expert, Dr. Kirsch, stated in vivo it would use more NADH than NADPH. Under the district court's claim construction, that preferred embodiment, which is specifically claimed, does not meet the definition. And so we asked the court to say the Methanococcus example was in the art. It was in the prior art. The district court said there's only one article and it doesn't have a lot of data in it, so I'm going to disregard it. I believe that is just error. That Methanococcus example is a specific enzyme. A chemical entity and its properties are one and the same in patent law. Those properties existed. GEVO itself, in its later patent application, the builder application, states that the Methanococcus example can be used for this co-factor switching. And when you put all that together, I ask this question, the applicant in the patent application wrote dependent for some enzyme, specific enzymes, not classes of enzymes, specific, where the literature said it. It said that when that's what the literature said. That's fine. If the applicant meant dependent for carry, applicant knew how to use those words because they used them elsewhere. They did not use those words for carry, and yet they are now being read in. And let us consider this. If applicant had put in the claim that the carry is NADPH dependent, what would have happened? The examiner would have said, I'm issuing a 112 rejection. You never say carry is NADPH dependent. You just say using. What do you mean? And the applicant would have to search the specification to show what was meant. What would the applicant point to? The arsenic number of their assay because that's the only information in the patent. And yet, during the free trial conference, after the summary judgment decision and the claim construction decision, I did walk through with the judge because I did not want to go to trial and try to pull a fast one and go around the court's claim construction. I said to the judge, our evidence is that using means using it in the test, and that if one is going to consider what NADPH dependent means, it would have to be using the arsenic assay. And I said, I don't think that's what you're allowing me to do. And the district court said, no, I'm not allowing you to do that. Thank you for explaining it to me. You're right. So we are precluded under this claim construction from using the very test that's in the patent. That should be error. And we ask the court to find simple definitions that allow us to go forward with this case. Before you sit down, Ms. Ben-Amy, I missed in the discussion in the briefs any mention of your opponents arguing the oral argument before this court, in the court below. Where will I find that in the record? You will find that in the red brief, I believe. Give me a minute. I will have a copy of that. Yeah, I'm going to ask your opponent about it. And I certainly am replying. I can come back and give that to you so we don't hold things up. But I would like to just follow this with a few points on the doctrine of equivalence. The summary judgment on the doctrine of equivalence was based on the fact that the district court did not find prosecution of history estoppel or even address prosecution of history estoppel. Therefore, there should be a reversal of that and a remand to go down on that issue. District court also compared NADPH with NADH, not carried, carried. That's also an error. And finally, we were left in a very strange position because if one were kind of going to consider the doctrine of equivalence, one would say, well, my closest example within my claim is the Mathenna-Cockett example because you, Steve-O, have admitted in your patent application that it works as well as your accused product. That would be very good doctrine of equivalence evidence. But given the court's claim construction, we cannot rely on the preferred embodiment, which is specifically claimed, to consider the doctrine of the program. And finally, Your Honors, on written description, both GEVO experts looking at the specification of the patent said to them, as those of sports skill in New York, the specification was telling you to knock out the PDC anytime. Both of them. The undisputed evidence of record is that you could buy a yeast with such knockouts. You could buy it in 2005. You could buy it online. This is factual anyway, right? Yes. And so my point is that on summary judgment, there should not have been a finding. All right. Thank you, Ms. Ben-Ami. Ms. Ryu. Good morning, Your Honors. May it please the Court. The specification is the primary basis for construing a claim. So I direct Your Honors to A00152, which specifically lays out the definitions that are to govern this specification and these patents. This is in the 188 patent. While the ordinary customary meaning of a term should govern claim construction, where an inventor defines the term, its own lexicography is what governs. That's what Phillips has told us. The Sinarcham case indicates that if you have quotation marks, that indicates there is a definition. And that's what's provided here. Would you address my question to your opposing counsel? Yes, Your Honor. My understanding of what she said was that when you went back down, that you argued questions from oral argument. Is that correct? I'm confused by that. So our understanding was that this court objected to the word solely in the prior claim construction. The court below eliminated that word from the construction. And the construction of the court below was to recognize that the original. What I want to know is where was the argument in the record? Where was the argument? Where was the argument below in the record so I can look at it? Maybe I'm just confused by what. In the red brief, Your Honor. In the red brief. In the argument below. Am I confused about that? I may have misunderstood. I may be misunderstood, Your Honor. But we did go back and completely brief the claim construction argument. Our arguments are based on the specification primarily. And that's where I'd like to focus today, if I may. I'd like my question answered. Is there anything in the record showing the district court's consideration of the oral argument before this court? I don't believe that the district court's order specifically notes the order of the Federal Circuit. Did you argue that in oral argument? Yes, we did in the transcript. And where is that in the record? I don't have that immediately at my disposal. But it is in the transcript of the summary judgment argument, which I don't believe in the appellate record. But going back to the specification on columns 7 and 8, it's very clear. Could I ask a question that's going to deal with the specification? Essentially what has happened here is that you have said that although there may be a customary meaning of the claim term, that they have surrendered significant scope, namely the use of NADH as a cofactor. Is there anything in the record where they say, no, you can't use NADH as a cofactor? It says that specifically, no NADH can't be used. Not in those words, but in the definitions. But isn't that rather important that you show us that? Particularly where the specification gives us the ARFN article and gives us claim differentiation and several other arguments to suggest that NADH is available under certain circumstances. I would like to address both of those arguments. Please do. So in columns 7 and 8, it specifically says that these definitions and abbreviations are to be used for the interpretation of the claims and the specification. And the definition of AAIR specifies that using NADPH cofactor. But it doesn't say NADPH dependent, does it? It doesn't for that specific definition, but it uses this term, using NADPH, in other portions of this definitional section. But why does that mean dependent? Because in other sections, the term use NADPH or utilizing NADPH is equated with NADPH dependent. And I can turn you to column 12, where there's reference to alcohol dehydrogenase 6. This is column 12 at line 54. 54? Yes. It refers to ADH6 and another enzyme, both of which use NADPH as electron donor. And NADPH dependent reductase, YQHD, active with branched-chain substrates, also has been recently identified in E. coli. But that's simply a statement. I'm not quite finished. So if we go to table 1 and we look up this ADH6 enzyme in table 1, it's toward the bottom, the ADH6 enzyme. It says S. cerevisiae, ADH6. I'm on table 1. Which column? Give me column and line. Column 4. It's in the table. And it's the entry that corresponds to the sequence ID number 201. What line? Line 61. I see it. 60 and 61. The ADH6 enzyme is equated with NADPH dependent. And similarly, in the next entry for clostridium acetobutylicum, the NADH dependent enzyme is listed. And there, if you go back to column 8, that enzyme is listed as being NADH using NADH. So we have two examples of equating use of NADPH with NADPH dependent and use of NADH with NADH dependent. The court found that the – I'm still not understanding how that gets around the ARFN article, which says you can use either. The ARFN article is – let me just finish this point, which is that the specification in the definitional section identifies enzymes that use NADPH, enzymes that use NADH, and enzymes that use NADPH or NADH. There are these three definitional buckets. And the interpretation that Butamax is propounding is eliminating the distinctions between these buckets. And to do that, they're rendering meaningless, significant proportions of this definitional section, specifically the definition of the branched chain alcohol dehydrogenase, which refers to enzymes that use NADH and or NADPH, and further down, the term acylating aldehyde dehydrogenase, also using either NADH or NADPH. Now let's talk about the ARFN and Umbarger assay. That assay is in the example section. The example section in the preparatory language specifically says that these are used for illustrative purposes only. This is not a definition. The ARFN and Umbarger assay appears nowhere in the definition of the AAIR in column 7. So that preparatory language for the examples is in column 26, line 25. It should be understood that these examples, while indicating preferred embodiments of the invention, are given by way of illustration only. But if they're a preferred embodiment, that, we have said over and over again, is almost per se a definition of what the claimed invention encompasses. But the assay isn't the preferred embodiment. If you go to example 2 at column 33, the example says, the purpose of this prophetic example is to describe how to clone the ILVC gene from E. coli K12 and express it in E. coli BL21A1. This is a specific E. coli enzyme. There's no question that that's an NADPH-dependent enzyme. And in order to confirm that that enzyme was properly cloned and expressed… What do you do with the claim differentiation argument, claim 14? Claim differentiation cannot trump the lack of written description. No, but it certainly confirms a customary meaning and a broad chemical definition that is used by the patent, right? If it's confirmed… In other words, I see you'd like to switch the burden to them to show that NADH is something necessarily to be used. But I perceive our law as putting the burden on you to show that they somehow disclaim the use of NADH. And so I'm trying to find anything in here that says, no, you cannot use NADH. The disclaimer of NADH… Is there anything like that? It comes from the express definition of these three buckets of enzymes. Those that use NADPH, those that use NADH, and those that use NADH… But I have to infer from that that they somehow intended the carry enzyme to be in one bucket and have nothing to do with the other bucket. And you're tied up by what you said before, which was in answer to Judge Rader's question, you said not specifically. The definitions identify these categories. The reason that they've identified those categories, and the court below found that use NADPH was synonymous with NADPH-dependent. The reason that they did that was because they weren't in possession of carries that used NADH. And the record shows that very clearly in… At A18346. This is an internal document from 2007, two years after this patent was filed. A183? A18346. Oh, 18346. 18346. 18346. I'm going to hold it and find it. 18346. Okay. In this discussion of the results from 2007, the scientists within Butamax recognized that AAIR, the carry, is NADPH-dependent. They recognized there was this imbalance of NADH and NADPH. That's a problem for them. And down below it says, in the long term, acetohydroxy acid isomeral reductase may be engineered to prefer NADH. They weren't in possession of this stuff, and that's why they deliberately did not claim it in the 2005 patent application that led to the 188 and 189… What's the next sentence mean? In the short term, they're generating some excess NADH. In the long term… I saw the long term. I'm asking about this next sentence. In the short term, one mole of excess NADH is generated for each mole of isobutanol formed. That means that in the isobutanol pathway, the pathway is generating more NADH than NADPH, and that's resulting in a bottleneck at this enzyme. And that's specifically acknowledged at A18341. This is a December 2005 document from Butamax. There, they specifically recognize that the ACARI enzyme is the Achilles heel of the isobutanol pathway. They refer to that enzyme as NADPH-dependent. They expect to engineer this to be specific for NADH to avoid yield loss associated with NADPH production. There's an imbalance in this pathway between the availability of the NADPH cofactor and the fact that the CARI that they claimed uses… Is this part of the extrinsic evidence that the district court is looking at? This is part of the extrinsic evidence, but it just confirms the specification, which shows that there were these three buckets and that they only claimed the bucket that uses NADPH, that is, is NADPH-dependent. Are you saying in these three buckets that each bucket is exclusive? Yes. So that… Yes, I am, Your Honor. And that's the way that their expert understood it. I mean, if there are things that use NADPH and things that use NADH, that doesn't necessarily mean only NADPH. That's correct. Did the district judge refer to this material on 18341 and 18346? We certainly cited to it, and I couldn't tell you… She did not cite to it, is what you're saying. She did not rely on it. We provided it to her. Thank you. I think the answer was no, there's nothing expressed that she relied on it. Going to the Mazzanico… She didn't say at any point that they did not possess NADH, did she? What she did say was that those of skill in the art understood that uses NADPH is equal to NADPH-dependent. She reviewed the voluminous record and the publications that were raised by Budamax, and her fact-finding below was that scientific references almost exclusively characterized carry enzymes at that time as being NADPH-dependent. And that explains why use NADPH fell into this bucket of those that prefer NADPH or are dependent on NADPH. I come back to, again, is there anything other than your inferences that says expressly you cannot use NADH in this catalytic reaction as a co-factor? There is nothing that expressly says you cannot use NADH. The definitions define three exclusive categories, those that use NADPH, those that use NADH, and those that use either. Where in the specification does it say exclusive? These buckets are exclusive. It's in reading the specification in columns 7 and 8 and in identifying the way that they've described and used these terms, the way that they've described enzymes in using these terms. So, again, using Judge Rader's words, you're drawing an inference, are you now? But our law requires that if you're going to disavow some scope, it's got to be words of manifest exclusion. I think that's the case where it's strictly evaluating what the common and ordinary meaning is. But in this case, lexicography governs, and the lexicography demonstrates that there were these three categories of nicotinamide-utilizing enzymes. If you're to interpret use NADPH to say that any use as detected by the Arfan and Umbarger assay, which forces you to show use of NADPH because that's the only cofactor that's provided in that assay, then you've eliminated these three important distinctions that were deliberately laid out in columns 7 and 8 in defining these enzymes. You made reference earlier in your argument in the 188 specification to places where there was examples of equivalency between something that is using and something that is dependent. Yes. But that equivalency isn't used in association with the... The carry enzyme? The carry enzyme. It's not. So doesn't that cut the other way? Because that shows that if the applicant really intended this to be dependent, they knew how to say that. They said it with respect to other things, but they didn't say it with respect to the carry enzyme. I don't believe that's the case because the section is preceded by the suggestion that these definitions are for the interpretation of the claims and the specification. So if you're trying to interpret what does using NADPH mean in the context of the definition for AAIR, then you must also look at the other uses of using NADPH in the definition section. And as I said before, if you're to eliminate the distinctions between these categories, then that renders meaningless the express definitions that were provided by the patentee. And as for the methanococcus example, that example is... Even if you accept what they say, which relies on extrinsic evidence, the Zing reference, which is never cited in the patent, it's still an enzyme that prefers or is dependent on NADPH by at least a factor of two. But better than that, you go back to the specification which specifically cites to the methanococcus enzyme at line 45 of column 7. There's a GenBank number that's cited to there, and that GenBank number takes you to a publication, which is the Henriksen publication. And the Henriksen publication, at A18288, it's a figure, and about in the middle of the figure, shows tyrosate to KIV. That's the relevant reaction here. It shows NADPH as a cofactor, not NADH. So based on the information... It doesn't say you can't use NADH, it just shows NADPH. It shows that... You have a final thought for us here. Pardon me? You have a final thought for us. The final thought is that both with this argument on claim construction and with the written description argument, the patentees are trying to preempt the future before it has arrived. They're trying to claim things that they hadn't invented that were not part of the written description. This was evidenced by the Donaldson continuation in part... Well, it sounds like then you may have an improvement patent which you could file, and there would perhaps be blocking patents that would be determined as to their value in the future. It doesn't sound to me like you've created an exclusion on their use of a broad customary definition. They simply weren't in possession of cards that used NADH, and that's demonstrated by the fact that later the AAR definition was revised in the Donaldson CIP to include use NADH in addition to use NADPH that tells you that use NADPH before referred only to the first bucket. Thank you, Ms. Ruiu. And Ms. Benami, you have your rebuttal time. Your Honor, I would like to answer Judge Walton's question. I just don't know. At A10097, in the summary of the argument on summary judgment of infringement... A10097? A10097. Unfortunately, there are pages that are taken out over time, so the numbers are not... They are chronologically sequential, but there are missing pages, obviously. It takes a while to find them. Okay. I'm there. All right. But in that page under B, summary of argument B, 1B, it says, the Federal Circuit's affirmance does not question the essence of this Court's earlier claim construction. In A10781, which is argument... That is a mini-script. Yeah. A10781. Okay. A10781, looking at the bottom... Bottom of line 25, Federal Circuit fundamentally agreed with your construction. Yes, 25 going up to 26. See, I underlined that in red, so I must have seen it. Yes. So, and we point the other things out in our brief, but hopefully I've answered your question in my brief. Ms. Benami, Column 7 does use the term using NADPH, and of course Ms. Ryu takes that from using to NADPH dependent, but it does say using NADPH. Yes, so this is an issue of false logic, basically. If I am NADPH dependent, I am using NADPH. But if I am using NADPH, it does not mean I am necessarily NADPH dependent. That is the distinction. Well, of course she goes on to say there are buckets, and the buckets show that by using NADPH, you meant only NADPH. Well, what I would say to that, Your Honor, is there are no buckets. It is a continuum. That's what GIVO's own expert, Dr. Kirsch, stated. He testified to that. It's in our brief. Is this after a rising technology? Did you possess NADH at the time? Well, we had the Nathanococcus example, actually, which GIVO has tested, or Caltech working with GIVO tested and proved, was NADH utilizing, and which GIVO's patent application specifically states, can be used as for NADH dependence, and which Dr. Kirsch said in VIVO will use 10 times more NADH than NADPH. So I seem to be right that this was an improvement patent, if anything? I think if someone figures out how to make a carrying which they prefer, and it's not anticipated or obvious, they may have an improvement. But if I've built an engine, and you build a turbocharged engine, it's still an engine. And so this case boils down to a pretty simple thing. The fact that I use something doesn't mean it's necessarily dependent. The fact that something, it means it's using it. There's a clear assay. There is nothing about carry in this patent anywhere, which gives you a test for dependency. And I will end with this, Your Honor. Since my time is really up, I think. But I think... We gave a little extra time to Ms. Ryu. I think I need to make this point. When we decide claim construction, I think we need to decide based on consistency and definitiveness. Consistency here requires the simple definition, because for all the reasons we've gone through. But it's also important to note that the district court, in deciding it meant dependent, and it's in a footnote where she really goes through it, stated that she had searched not only the record, but the after art, after 2005. She had looked through this, and she said, there's nothing to quantify this. And she confirmed that during oral argument. We couldn't figure out how one would measure this, she said. And so she said, we'll let the experts go to the jury and tell the jury what they think this term of art means. That is basically having the two experts argue claim construction to the jury, which fundamentally is not allowed under the jurisprudence of this court. You have a simple definition, it's clear, it's supported by the test and the patent. You have an alternative definition, which is not in the patent, not in the test, which can't be quantified. And we'll have competing experts get up and talk about what that means in the art, having scoured the record. But the one thing it cannot mean, according to the district court, is the test and the patent. That must be it. Thank you. Thank you. Thank you very much for both counsel.